**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Stanford L. Miller,

Plaintiff,

v.

Conseco Finance Servicing Corp.,

Defendant.

Civil No. 01-757 (DWF/AJB)

**MEMORANDUM OPINION AND ORDER**

---

William J. Egan, Esq., William J. Egan & Associates, PLC, 150 Edina Executive Plaza, 5200 Wilson Road, Edina, MN 55424, counsel for Plaintiff.

Ann Huntrods, Esq., Debra K. Revzen, Esq., and Michelle K. Peterson, Esq., Briggs & Morgan, W2200 1st National Bank Building, St. Paul, MN 55101, counsel for Defendant.

---

## Introduction

The above-entitled matter came on for hearing before the undersigned United States District Judge on June 21, 2002, pursuant to Defendant's Motion for Summary Judgment. By his complaint, Plaintiff, Stanford Miller ("Miller") alleges discrimination and retaliation on the basis of race. Miller alleges discrimination on the basis of race in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C.§ 2000e, *et seq.*, as amended, the Civil Rights Act of 1866, 42 U.S.C. § 1981, *et seq.*, as amended, and the Minnesota Human Rights Act, Minn. Stat. § 363.01, *et seq.* ("MHRA"). For the reasons set forth below, Defendant's motion is granted.

## Background

Miller, who is African-American, was employed by Conseco Finance Servicing Corporation ("Conseco") and Conseco's predecessor in interest, Green Tree Financial

FILED JUL 11 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD JUL 1 1 2002
DEPUTY CLERK

Corporation, from July 1,1996, until June 15, 2000. Conseco is a financial services company that extends consumer and commercial credit nationwide.

Miller was originally hired by Conseco as a Regional (Midwest) Credit Manager for the Equipment Finance Division. Miller was hired and supervised by Jeff Vanthournout ("Vanthournout"), Senior Vice President of Conseco's Equipment Division. Miller managed the Equipment Finance Division's credit department, which included hiring, training, and supervising the credit department's staff. Miller also approved and denied credit applications by dealers. In this position, Miller was paid an annual base salary of $80,000 plus bonus opportunity. In 1996, Miller received $20,000 in bonus pay, bringing his total compensation to $100,000. In July of 1997, Miller received a "very good" performance evaluation by Vanthournout. Subsequently, Miller received a 10 percent increase in salary to $88,000 and a bonus of $30,000, bringing his total compensation in 1997 to $118,000.

On September 30, 1997, Miller received a written warning from Vanthournout for violating lending policies. These violations included: (1) failing to provide written documentation regarding the approval of a loan transaction; (2) failing to call the borrower's references to verify its payment performance history; and (3) exceeding his lending authority.

Subsequently, in October of 1997, Miller and Conseco mutually agreed that Miller transfer to another position within Conseco. In October of 1997, Miller was offered three positions, one of which was a Regional Fleet Sales Manager position reporting to Vanthournout. Miller alleges that he was offered the position of National Fleet Sales Manager at this time; however, the National Fleet Sales Manager position was already held by Charles McCormick. Conseco maintains that Miller's belief was based on Vanthournout's alleged statement that the Fleet Sales manager position he was offered "was a national position and that he would be responsible for half of the United States." In November of 1997, Miller began officially working

as a Regional Fleet Sales Manager. At this time, Miller was informed that his title was Regional Fleet Sales manager for the Western Region, not National Fleet Sales Manager, and he was assigned the western half of the country as his territory. Miller was informed that he reported to Charles McCormick, the National Fleet Sales Manager. McCormick was responsible for the eastern region. However, Vanthournout supervised Miller because McCormick was officed outside of Minnesota. Both McCormick and Vanthournout reviewed Miller's performance. Vanthournout granted approvals on all sales. In this position, Miller maintained his base salary of $88,000 and received a fixed commission multiplier of .25% above quota.

Miller's first allegation of discrimination relates to his commission plan in comparison to his white peer, McCormick, in 1998. McCormick had a higher base salary and commission rate than Miller. McCormick's base salary in 1997 and 1998 was $136,000 compared to Miller's salary of $94,000. McCormick was also paid a higher commission rate. McCormick was paid quarterly. In contrast, Miller was paid an annual commission. McCormick was also allowed to pursue business from third-party brokers, while Miller was not.

In July of 1998, McCormick evaluated Miller's performance and gave him a "proficient/good" rating. Miller received a five percent increase in his base salary, which brought his annual base salary to $92,400. McCormick suggested Miller improve his customer base by attending more trade shows and national fleet meetings.

In September of 1998, Miller filed a complaint alleging bias and harassment by Vanthournout and Conseco with Conseco's Human Resources Department. Barbara Didrickson, Senior Vice President of Human Resources, and Jerry Britton, Executive Vice President, met with Miller regarding his complaint. During this meeting, Miller did not mention race discrimination. Miller's letter also did not include a claim of racial discrimination. In his letter, Miller claimed that Vanthournout was holding him to a higher standard than others, controlled

his compensation, and discriminatorily denied his loan applications. Miller requested an independent analysis of his job function and compensation package. Miller's letter referred to hostile conditions, harassment, ridicule and bias by Vanthournout, but did not claim that this treatment was based on racial discrimination. Although Miller testified that Vanthournout allegedly made a racially derogatory comment regarding Hispanic truck drivers in 1997, there is no mention of this instance nor any other racially discriminatory conduct in his complaint to Human Resources.

On October 3, 1998, McCormick responded to Miller's letter in writing stating that he believed his review of Miller's performance as proficient/good was accurate. McCormick maintained that Miller was not rated or treated unfairly, held to higher standards, or limited in accomplishments. Vanthournout also responded to Miller's complaint. Vanthournout recognized that Miller had a slower than normal review process, but reasoned that this was because Miller's salary was higher than the range of his position and therefore required Britton's approval. Vanthournout also recognized the sources of new business generated by Miller and suggested that Miller would have to work 60 to 70 hours per week to develop a customer base equal to McCormick's. Finally, Vanthournout stated Miller never expressed any concerns to him regarding unfair treatment or compensation. George McMackin, a Strategic Planner for the Equipment Finance Division, conducted a review of Miller's loan approvals. McMackin concluded that there was no pattern of discrimination or inconsistencies between Miller's transactions and transactions submitted by others.

Based on this review, their interview with Miller, the letters from Vanthournout and McCormick, and a review of the various compensation plans, Didrikson and Britton determined that there was no evidence of inconsistencies in underwriting and that Miller's compensation was more than fair.

In October of 1998, Vanthournout was asked to resign from Conseco. This request was based on Vanthournout's aggressive management style and his general disrespect for all employees. Furthermore, Britton and Vanthournout were unable to work together.

Effective December 31, 1998, McCormick resigned. Miller then reported directly to Paul Erwin, National Sales Manager. Miller again requested a new commission structure. Miller suggested his annual sales target be lowered from $20 million to $12 million, and that he be provided more cash awards for attainment of certain volume levels. Erwin denied Miller's requests except for a weighted approach allowing Miller to receive different commissions for each product type depending on whether he financed a new, used, or leased vehicle.

On November 4, 1998, Miller requested that Didrikson and Britton reconsider their decision that his compensation plan was equitable. Miller requested that his base salary remain at the current level, but that his commission plan be increased. Specifically, Miller requested the higher commission plan of a Marketing Representative, without the lower base salary of a Marketing Representative. In the alternative, Miller requested McCormick's higher commission plan without McCormick's higher volume target of $36 million. At the time, Miller's volume target was $20 million.

Miller's second allegation of discrimination relates to the commission plan of another white peer, Andrea West, in 1998. In December of 1998, West, a District Sales Manager, was assigned to the position of Regional Fleet Sales Manager for the Western Region. West had previously worked as a Marketing Representative. West was assigned to the Western region because she was from California and had many contacts on the West Coast. Subsequently, Miller was reassigned to the Eastern region, but allowed to retain his fleet customers located in the Western Region.

Miller alleges that he and West were not on the same commission plan. Conseco maintains that West and Miller were on the same commissions plan: a $20 million annual sales target and a .25% commission multiplier payable quarterly. West received a guaranteed commission of $5,000 per month for the first three months while in her new position; however West was only in this position until April of 1999. Regardless, West was earning a salary of almost $20,000 less than Miller. West was paid an annual salary of $75,000 compared to Miller's annual salary in 1999 of $94,577.

Miller alleges that as a Regional Fleet Sales Manager, West was permitted to be paid at the sliding scale commission plan of the Marketing Sales Representative. Miller alleges that Marketing Sales Representatives had lower monthly targets and a better, sliding scale commission plan. Miller requested and was denied the opportunity to participate in the commission rate plan offered to Marketing Representatives.

In March of 1999, West requested a change to her compensation or her position. The transition to fleet sales was difficult and she was unhappy with her situation. Erwin proposed two options to West: return to her position as a Marketing Representative with the respective commission plan and a lower base salary of $60,000, or continue as a Regional Fleet Sales Manager for the Western Region with the fleet manager's commission plan and a higher base salary of $90,000. West chose to return to the Marketing Representative position.

Conseco asserts that due to a paperwork error, from April of 1999 until December of 1999, West inadvertently retained her title and base salary pay of a Regional Fleet Sales Manager of $75,000 per year. The paperwork and title change was corrected in late 1999. Effective April 1, 1999, West was performing as a Marketing Representative. West's monthly sales target was reduced to $1 million, the same as other Marketing Representatives, compared to Miller's, which was $1.66 million.

In January of 1999, Erwin conducted Miller's performance review and rated his performance above expectations. Miller subsequently received a 2.36% increase in base salary. In 1998, Miller achieved $34 million in sales. Miller was paid $28,296.72 in commissions for his 1998 sales performance.

In November of 1999, Conseco discontinued originating fleet and brokered contracts in its Transportation Division, and as a result eliminated Miller's position. Subsequently, Miller began a new position as a Marketing Representative effective January 1, 2000. Miller was reassigned to a new territory, received a salary reduction of 22% to $75,000, and was moved to the Marketing Representative commission plan. However, Miller received his base salary of $94,577 until April 1, 2000 as a form of transition pay.

Miller's third allegation of discrimination involves his ineligibility to participate in the "President's Club." "President's Club" was an all expense paid trip to reward Marketing Representatives who achieved an annual volume target of over $25 million. In January of 2000, Miller received a very good performance review and was rated four out of five possible points. In 1999, Miller achieved $46 million in total sales volume compared to his target volume of $20 million. Despite Miller's performance, he was not eligible for the "President's Club" because he was not a Marketing Representative during 1999. West was eligible for this trip because she was a Marketing Representative from April through December of 1999.

In March of 2000, Miller wrote a letter to Senator Glenn Howard of Indiana claiming for the first time that he was the target of race discrimination. Senator Howard forwarded the letter to Steve Hilbert, the former CEO of Conseco Finance's parent company, Conseco, Inc.

On May 13, 2000, Erwin notified all Marketing Representatives that their positions were being eliminated as of June 15, 2000, due to Conseco's business decision to discontinue the origination of new contracts with dealers.

On or about August 21, 2000, Miller filed a charge of racial discrimination with the Minnesota Department of Human Rights ("MDHR"). The charge was then cross-filed with the U.S. Equal Employment Opportunity Commission ("EEOC"). On April 20, 2001, Miller received a Notice of Right to sue from the EEOC.

**Discussion**

**1. Standard of Review**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court must view the evidence and the inferences, which may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank of Missouri*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" Fed. R. Civ. P. 1. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enterprise Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record, which create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Andersen v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Krenik*, 47 F.3d at 957.

**2. Race Discrimination and Retaliation Claims**

Miller alleges that between 1996 and June of 2000, Conseco engaged in discrimination and retaliation on the basis of race in violation of 42 U.S.C. § 2000e-2(a) (Title VII), 42 U.S.C. § 1981 and the MHRA.

Specifically, the bases of Miller's discrimination charge are: (1) discrimination in his commission plan compared to his white peer, McCormick, in 1998; (2) discrimination in his commission plan compared to his white peer, West, in 1999; and (3) his exclusion from the Marketing Representative trips and the President's Club in 1999 and 2000 for 1998 and 1999 performance. Miller's claim is essentially an equal pay for equal work claim. The Court finds these claims unavailing for the following reasons.

**a. Racial Discrimination Claims**

As an initial matter, the Court recognizes that portions of Miller's claims may be barred by the statute of limitations. However, under the circumstances, the Court will not parse out which claims are time-barred and, instead, the Court treats all of Miller's claims as viable because Miller's claims all fail on their merits.

Conseco proposes that Miller's claims are based on circumstantial rather than direct evidence and, therefore, must be analyzed under the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Miller bears the burden of first establishing a *prima facie* case of race discrimination by showing that: (1) he is a member of a protected group; (2) he was qualified to perform his job; (3) an adverse employment action was taken against him; and (4) there was a causal connection between the adverse employment action and his membership in the protected group. *McDonnell Douglas,* 411 U.S. at 802; *Barge v. Anheuser-Busch, Inc.*, 87 F.3d 256, 259-60 (8th Cir. 1996).

Miller alleges he was discriminated against specifically with respect to compensation and that the McDonnell Douglas analysis is inappropriate. Miller argues that in order to establish a case of unequal pay, plaintiffs must demonstrate "'that [they] were performing work substantially equal to that of [white employees] who were compensated at [ ] higher rate[s] than [they were].'" *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1087 (3rd Cir. 1996) (quoting *Hohe v. Midland Corp.*, 613 F. Supp. 210, 214 (E.D. Mo.1985), *aff'd without op.*, 786 F.2d 1172 (8th Cir.1986)). Miller maintains that this test does not include proof of a causal connection between the adverse employment action and the plaintiff's membership in a protected group. That is a requirement only of a retaliation claim, not a discrimination claim.

Regardless of which legal test the Court employs, Miller's claims fail as a matter of law for failure to show that similarly situated white employees were treated more favorably than Miller.

The Plaintiff has the burden of proving that he and the disparately treated whites were "'similarly situated in all relevant respects.'" *Jones v. Frank,* 973 F.2d 673, 676 (8th Cir.1992) (quoting *Lanear v. Safeway Grocery,* 843 F.2d 298, 301 (8th Cir.1988)).

Miller alleges that he was similarly situated to McCormick, who received more favorable treatment. It is true that McCormick had a higher base salary and commission rate than Miller. McCormick's base salary in 1997 and 1998 was $136,000 compared to Miller's salary of $94,000. However, Miller and McCormick were not similarly situated. McCormick had 30 years of experience working with large fleet accounts; Miller had no previous experience in fleet sales. Miller's previous experience was in lease sales and portfolio management, credit administration, and loan and credit review. McCormick was hired to start up the fleet division at Conseco based on his contacts and relationships in the fleet industry. He was also hired to train and guide new employees. McCormick was the National Fleet Sales Manager while Miller was

the Regional Fleet Sales Manager. Miller reported to McCormick. McCormick had a higher annual volume target. McCormick's annual volume target was $36 million. Miller's target was $20 million.

Miller further argues that he was not treated fairly relative to the Marketing Representatives. The Court finds that Miller was also not similarly situated to the Marketing Representatives. Miller received a significantly higher base salary than Marketing Representatives. The Marketing Representatives sold a different product type than Miller, had a smaller geographical territory than Miller, had a different client base, and worked out of their homes. Miller cannot compare himself to the Marketing Representatives because his position was qualitatively very different from theirs. Moreover, while the Marketing Representatives had more favorable commission structures, Miller's much larger base salary precludes any meaningful comparison between their compensation and his.

Although Miller and West were similarly situated for three months, Miller actually had a $20,000 higher base salary than West. Miller's claim that West was treated differently because she was transferred back to her previous position as a Marketing Representative does not support his allegations that he was treated unfavorably. Miller never requested to transfer to a position as a Marketing Representative. Miller only requested the higher commission plan of a Marketing Representative and that he retain his higher base salary. No one at Conseco had this opportunity. When West transferred back to her position as a Marketing Representative, she was not allowed to retain her title and salary as a Regional Fleet Sales Manager and receive the commission plan of a Marketing Representative. The fact that West maintained her title and salary from April to December was a paperwork error and it was corrected upon discovery. Effective April 1, 1999, West was performing as a Marketing Representative. Conseco did not permit West to continue

as a Regional Fleet Sales Manager with a higher base salary and the higher commission plan of a Marketing Representative as Miller maintains and requested.

Miller also had a predecessor, Mike Lewis, in the position of Regional Fleet Sales Manager. Lewis, a white employee, was not treated more favorably than Miller. In fact, Lewis's base salary was $28,000 less than Miller and he had a higher annual volume target than Miller.

Finally, Miller maintains that he was discriminated against because he was not eligible to receive the President's Club incentive trip. Conseco maintains that this trip was only offered to Marketing Representatives and a few select individuals outside of that group who were invited based on other criteria. For example, McCormick attended the trip in 1997 as a National Fleet Sales Manager. Miller has not identified any similarly situated white employee who was given this opportunity, nor has he offered any evidence of a causal connection between his race and his exclusion from the trip.

**b. Miller's Retaliation Claims.**

To prove his retaliation claims under both federal and state law, Miller must demonstrate that: (1) he engaged in a statutorily protected activity; (2) that he suffered an adverse employment action; and (3) there was a causal connection between the adverse employment action and the protected activity. *Stevens v. St. Louis Univ. Med. Ctr.*, 97 F.3d 268, 270 (8th Cir. 1996); *Coffman v. Tracker Marine, L.P.*, 141 F.3d 1241, 1245 (8th Cir. 1998). The burden then shifts to Conseco to proffer a legitimate, non-discriminatory reason for the adverse action. *Amir v. St. Louis Univ.*, 184 F.3d 1017, 1025-26 (8th Cir. 1999) (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506-507 n.1, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993)). If Conseco makes this showing, the burden of production then shifts back to Miller to show that Conseco's reason is a pretext for retaliation. *See Hicks* at 507-508; *Amir* at 1026.

Protected activity is "an informal or a formal complaint about, or other opposition to, an employer's practice or act . . . if the employee reasonably believes such an act to be in violation of the statute in question." *Sherman v. Runyon*, 235 F.3d 406, 409 (8th Cir. 2000). A protected activity can be either opposing an act of discrimination made unlawful by Title VII or the MHRA ("the opposition clause"), or participating in an investigation under Title VII or the MHRA ("the participation clause"). 42 U.S.C. § 2000e-3; Minn. Stat. § 363.03, subd. 7; *Brower v. Runyon*, 178 F.3d 1002, 1005 & n.3 (8th Cir. 1999); *Kempcke v. Monsanto Co.*, 132 F.3d 442, 445 (8th Cir. 1998). Miller makes two claims of protected activity: his 1998 complaint to Human Resources, and his March 2000 letter to Senator Glenn Howard.

Miller maintains that Conseco's hiring of Andrea West as a Regional Fleet Sales Manager; Conseco's assignment of Miller to the Eastern region, previously held by McCormick; and Miller's ineligibility in the President's Club trip were adverse employment actions taken against him in retaliation for statutorily protected activity. The Court does not need to determine whether or not these actions constitute adverse employment actions nor does the court need to consider whether they are causally connected to any protected activity based on the Court's conclusion that Miller did not engage in any statutorily protected activity prior to these actions.

Miller's claims of retaliation cannot be supported by his 1998 written complaint to Human Resources and his interviews regarding this complaint because Miller never claimed race discrimination in this complaint. Furthermore, in Miller's deposition, he confirmed that this 1998 complaint was not a complaint of race discrimination. His 1998 complaint addressed his concerns regarding the differences between commission plans and Vanthournout's unfair treatment of Miller. Yet, Miller never suggested that his concerns were race-based. Indeed, Miller argues that he did not mention race because he did not want to be perceived as making a

race-based claim. He cannot now claim that Conseco should have looked beyond his purposeful obfuscation and deduced that his complaint was really one of race discrimination.

Miller's claims of retaliation cannot be supported by his March 21, 2000, letter to Senator Howard because he did not suffer an adverse employment action after this date. Miller does not claim that his termination on June 15, 2000, was racially motivated and all of the adverse action alleged by Miller took place before the letter.

In sum, Miller has failed to allege any actionable conduct by Conseco, which could be construed as being motivated by unlawful racial animus. Conseco is entitled to summary judgment on all claims.

For the reasons stated, **IT IS HEREBY ORDERED:**

1. Conseco's Motion for Summary Judgment (Doc. No. 15) is **GRANTED**; and
2. The **COMPLAINT** is **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: July 11, 2002

DONOVAN W. FRANK
Judge of United States District Court

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES:

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;' or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information <u>must</u> be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*